Leo HEBERT, dba Leo & Willie's, et al., Appellants,

v.

Victor E. LOVELESS, Conrad Webb et al., Appellees.

No. 7268.

Court of Civil Appeals of Texas, Beaumont.

Nov. 18, 1971.

Orgain, Bell & Tucker, Rienstra, Rienstra & Dowell, Beaumont, for appellants.

Frank Lamson, Black & Black, Port Arthur, for appellees.

KEITH, Justice.

The defendants below appeal from an unfavorable judgment in a suit arising out of food poisoning. Plaintiffs were patrons in a restaurant owned by Hebert and all became ill soon after consuming food, ice, or beverages in the restaurant. The ice was manufactured by the defendant ice company while the food and beverage was prepared by the restaurant owner. Suit was brought under the theory of strict liability and breach of the implied warranty that the food, ice and beverages served to plaintiffs was fit for human consumption and contained no deleterious or harmful substances.

Based upon favorable findings, the patrons recovered judgment against the restaurant and the ice manufacturer, jointly and severally, for their damages fixed by the jury. The restaurant recovered judgment for lost profits and full indemnity for what it might be called upon to pay to the patrons. Restaurant's recovery was based upon findings that the ice was the sole producing cause of the patrons' damages and restaurant's loss of profits. Both defendants have appealed from the judgment entered based upon the jury verdict.

The defense of the restaurant was basically offensive in nature in that it sought to prove that the ice which had been supplied to it for use in the restaurant was impure and unwholesome. The ice was supplied in large canvas bags having a zinc-coated metal bottom. It was the restaurant's theory of the case that the operating practices of the ice company were such as permitted salt, brine and other contaminants to come in contact with this metal bottom of the bag dissolving the zinc coating which then mixed with the melted ice. This chemical solution, according to the restaurant's theory of the case, rendered the ice so furnished to it for service to its patrons unfit for human consumption.

The jury found that each of the three plaintiffs did consume "food, ice or beverage which was unfit for human consumption"; that "such food, ice or beverage was a producing cause of said persons' damages"; that each of the persons consumed ice which was unfit for human consumption; that the ice so consumed was the sole producing cause of said persons' damage; and, that the ice so consumed was a producing cause thereof. The jury also found that the ice was unfit for human consumption at the time it was delivered to the restaurant; that the condition of the ice at the time it was delivered to the restaurant was the sole producing cause of the restaurant's damage—the loss of profits.

The ice company has no evidence, insufficient evidence, and great weight and preponderance of the evidence points leveled at each of the findings summarized. Defensively, the restaurant has similar points directed at the findings upon which the patrons' judgment was based; and, affirmatively, seeks to support the findings adverse to the ice company—the sole producing cause issues as to the damages recovered by the patrons and the restaurant which also support its indemnification against the recovery of the patrons.

We review an unusually long record and in our effort to keep the opinion within manageable limits, the statement of the facts will be restricted severely. Many persons were served by the restaurant upon the date in question without any untoward incident. Shortly after six o'clock P.M., a number of patrons became ill while at the restaurant or shortly after leaving the premises. Each of the plaintiffs herein became ill and displayed substantially the same symptoms: nausea, vomiting, diarrhea, and in at least one instance, fever. A large number of patrons were similarly affected, the number being variously estimated as anywhere from eighteen to forty-seven.

Many witnesses testified and the general pattern of development of the case was to interrogate the patron as to what he ate and drank on the occasion and then interrogate him as to its effect upon him. Fifteen persons testified that each became ill after consuming food, ice, or beverages at the restaurant on the date in question. The record also shows that an indeterminate number of patrons who also consumed food, ice, or beverage in the restaurant on the same occasion did not become ill.

Before eight o'clock on the evening in question, two health department inspectors procured samples of many items of food, melted ice, detergent, insecticides, etc. from the restaurant which were taken to Houston for analysis upon the following

day. These samples [1] submitted for examination included most of the items of food consumed by the patrons and the other suspected sources of the contamination. No bacteriological contamination was found in any of the items of food, nor were there any traces of the detergents or insecticides found therein. The melted ice samples were found to contain zinc at the ratio of one-tenth of one part per million parts water. A sample of vomitus from one of the patrons revealed that zinc was present at the ratio of one-fourth of one part per million parts. The laboratory supervisor, a chemist with an advanced degree in microbiology, said that both "chemical and microbiological examinations" were made of the food and "there were no bacteriological or chemical agents that we could consider to be involving food poisoning, or associated with this food that would be involved with food poisoning." As to the zinc found in the melted ice sample and in the vomitus, the witness said that the "concentration was not such to cause food poisoning" and that even in the case of the vomitus, the additional concentration was not of a sufficient amount "to cause any ill effects upon the body."

Dr. Joe B. Nash, an assistant professor at the University of Texas Medical Branch in Galveston, qualified as an expert in toxicology, "a sub-specialty of Pharmacology that relates to the injurious effect of chemicals on living species." In answer to hypothetical questions he ruled out bacteriological poisoning since it "requires an incubation time . . . to develop," some infections requiring from two to six hours while others require even longer to develop. It was his opinion that the patrons were affected by a chemical poisoning. Having reviewed the deposition testimony of the laboratory supervisor, he was of the opinion that the patrons suffered from chemical poisoning brought about by a chemical reaction between brine and other agents upon the zinc-coated metal bottom of the bags used to deliver the ice to the restaurant. This zinc poisoning, under his theory of the case, was the cause of their illnesses. He readily admitted that the amount of zinc found in the laboratory analysis was insufficient to cause illness, but he attributed this to improper sampling of the ice when the samples were gathered by the Port Arthur Health Department inspectors upon the night in question. He readily admitted that the finding of one-tenth of one part zinc per million parts of water, as revealed by the laboratory test of the melted ice, was not an unusual finding, but a very common finding. He said that thirty to forty parts zinc per million parts water "could be ingested without any symptomatology."

Dr. Nash testified that the melting ice in the bag in which it was delivered could not absorb any zinc from the lining but his theory was "that the people in the restaurant were given melted water from the bottom of the bag . . . or ice that had been contaminated with this water."

The witness testified that brine and salt solutions found around the ice manufacturing plant presented the "possibility of contamination" and "I think it would be unsafe to use these bags with the zinc coated containers" without regularly cleaning the bags.

One physician who testified expressed the opinion that the cause of illness was "something they had eaten or drunk" at the restaurant but he did not see any of the patrons immediately. From the history given to him, he diagnosed the condition as acute gastro enteritis. He told of repeated calls made to the county health officer in Port Arthur in an effort to learn the results of the laboratory tests and on July 15 (some twenty-five days after

1. Tests were made upon deviled eggs, brown gravy, garlic powder, toasted bread, untoasted bread, salad dressing, sliced salami, cuts of cheese, crab meat, peppers, sliced pickle, tossed salad composed of tomato and lettuce, French bread, melted ice.

the occurrence) Dr. Shields said that the health officer "stated that a definite diagnosis of zinc poisoning had been made by the State Health authorities."[2] This doctor was unable to determine the agent which caused the symptoms he found in his patients and did not know if it was bacterial or chemical in nature. This witness based his diagnosis of zinc poisoning upon what he learned from the county health officer, not from any examination of the patients or any laboratory analysis.

Another physician who treated one of the plaintiffs the day following the episode made the basis of this suit was of the opinion that the illness of his patient was "caused by something he ate or drank at Leo & Willie's that night." He also said that he had no idea whether the agent involved was "chemical or bacterial."

Without recounting the details, it is sufficient to say that counsel for the restaurant developed testimony which would support a finding that the containers in which the ice was delivered were not handled in the most sanitary manner and that there was more than a possibility of brine or salt solutions coming in contact with the metal bottoms of the bags. Likewise, the restaurant offered testimony which supported its theory that the ice served to the patrons was in substantially the same condition when served as when delivered to its place of business by the manufacturer.

Counsel for the restaurant, summarizing the evidence, states that "there is evidence that 19 people got sick; of these 19, 17 definitely had ice during the course of their meal." This figure of seventeen having ice includes Shirley Webb about whom there is some dispute between the parties. Nevertheless, the statement so made in the brief seems to be substantially true to the record, although counsel for the ice company draws slightly different conclusions from his analysis of the same testimony.

In short, we have a record which reveals that a large number of people became ill while patrons at a restaurant from something ingested there; but, we do not have *any proof from any source* of the specific cause thereof. The scientific proof offered—the laboratory tests—of the food and the ice does not reveal either bacteriological or chemical contamination sufficient to explain the illness of the patrons. There is no medical testimony in the record based upon any competent evidence which would account—medically—for the simultaneous onset of the illness in the patrons. Although suggestions were made, more in the nature of innuendoes, that there was a possibility of contamination of the food or beverage by insecticides or detergents used in the restaurant, the proof does not rise to the level of a mere scintilla of evidence.

■ At the outset, we return to the question reserved in footnote 2, supra, Dr. Shields' statement as to what the physician in charge of the local health department told him as to the diagnosis made by the State Health Department. The ice company contends that it was error for the court to admit such testimony and the restaurant responds by contending that the objection came too late. We do not reach the question of the timeliness of the objection. Obviously, the testimony was hearsay in every respect. We apply as the rule of law to the question presented that set out in Aetna Insurance Company v. Klein, 160 Tex. 61, 325 S.W.2d 376, 381 (1959):

> " 'When the appellate court comes to apply the law to testimony constituting the facts in the case, it can only base its conclusion upon such testimony as is under the law competent. That which is not competent testimony should be

2. Ice company's complaint that this hearsay evidence was improper and its admission was reversible error will be treated later.

given no probative force.' Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, 538."

■ Hearsay testimony is not competent testimony and "can never form the basis of a finding of fact or of the judgment of a court; and this is so whether it be objected to or not." Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628, 631 (1941). Consequently, this testimony of Dr. Shields has no probative force and does not furnish any evidence supporting the finding that zinc poisoning was the producing cause of the illness suffered by the restaurant patrons. We do not pass directly upon ice company's tenth point; but, on the other hand, we do not consider the testimony of Dr. Shields in this connection as having any probative force.

■ Texas is firmly committed to the rule stated in The Restatement of Torts (2d Ed.), § 402A, under which this case was tried. Pittsburg Coca-Cola Bottling Works v. Ponder, 443 S.W.2d 546, 548 (Tex.Sup.1969). In order to prevail under the rule of strict liability, each individual restaurant patron was faced with the "prime requirement for imposing liability on a seller": making proof that the injury which he sustained was proximately caused by the unwholesome and unfit condition of the food, beverage, or ice served to him. Ponder Case, supra (443 S.W.2d at p. 548); Carroll v. Ford Motor Company, 462 S.W.2d 57, 60 (Tex.Civ.App., Houston [14th Dist.] 1970, no writ); Coca-Cola Bottling Co. of Lubbock, Texas v. Fillmore, 453 S.W.2d 239, 241 (Tex.Civ.App., Amarillo, 1970, no writ); Wire Rope Corporation of America v. Barner, 446 S.W.2d 361, 363 (Tex.Civ.App., Tyler, 1969, no writ).

■ Dean Keeton in his article "Products Liability—Liability Without Fault and the Requirement of a Defect", 41 Texas L.Rev. 855, 858 (1963), says:

"The principle of strict liability has been regarded as applicable only when the product leaves the manufacturer's hands in a defective condition. Liability on the basis of an implied warranty or breach of a tort duty independent of the contract is not so strict or absolute as to justify a recovery on the part of a user who merely shows that an injury was suffered in the course of a use or shortly thereafter."

Similarly, in Proctor & Gamble Manufacturing Co. v. Langley, 422 S.W.2d 773, 778 (Tex.Civ.App., Dallas, 1967, error dism.), the court said: "As a general rule the fact that injury follows the use of the product is not of itself alone a basis for a finding of proximate cause."

■ The fact that the patrons did not offer any direct evidence of the unwholesome nature of the food or a condition therein which rendered it unfit for human consumption is not dispositive. They did prove beyond peradventure of doubt that a large number of persons were afflicted almost simultaneously with the same illness. Thus, in measuring the type of proof necessary to support their recovery, we turn to Chief Justice Calvert's remarks in Ponder, supra (443 S.W.2d at p. 548). Speaking of the "prime requirement" imposed upon the party relying upon the doctrine of strict liability—the necessity of showing a defective condition in the product when it left the hands of the manufacturer—the Chief Justice said: "This is not to say that proof of the defect must be made by direct or opinion evidence; it usually can only be made by circumstantial evidence. As an example, see Darryl v. Ford Motor Co., supra, 440 S.W.2d 630 (Tex.Sup.1969)."

■ An examination of Darryl discloses that circumstantial evidence was the base of the recovery there permitted. Justice McGee first invoked the "sealed container" theory exemplified by McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 792 (Tex. Sup.1967) and commented that a brake rod on an automobile which will bend to such an extent that it will not activate the braking system is necessarily "unreasonably

dangerous," and then went on in this manner:

> "To exclude circumstantial evidence that the product was defective at the time of the sale would frustrate the beneficial purposes of the doctrine. It would be equally difficult, if not impossible, for the plaintiff to rebut by direct evidence all of the conceivable possibilities which would account for the defective condition other than the existence of the defect at the time of the sale. *Such direct evidence should not be required, particularly when dealing with a latent defect.*" Darryl v. Ford Motor Co., supra (440 S.W.2d at p. 632. [emphasis supplied]

There is no doubt but what the defect in the food, ice, or beverage involved here was latent. No witness testified to any unusual odor, taste, or appearance of any of the items consumed before becoming ill. The question which we now must face may be stated simply: Where a large number of patrons in a restaurant become ill from ingesting substantially the same items, is each plaintiff required to establish specifically the cause of his illness? From our study of the record and the authorities, we answer our question in the negative.

In commenting upon the circumstantial evidence rule in a products liability case involving animal feeds, the court in Mc-Millen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123, 130 (Tex.Civ.App., Austin, 1966, error ref. n. r. e.), said:

> "Any disputed fact may be established by circumstantial as well as by direct evidence. In neither case is the burden of proof greater than the preponderance. This rule does not require the quality of absolute certainty, nor does it require the plaintiff to exclude every other possibility. All that is required of such rule is that the circumstances point to the ultimate fact sought to be established with that degree of certainty as to make the conclusion reasonably probable."

The only "ultimate fact" required of plaintiffs in this instance was the unwholesome nature of the food, beverage, or ice which was served to them. *Cf.* C. A. Hoover and Son v. O. M. Franklin Serum Company, 444 S.W.2d 596, 598 (Tex.Sup. 1969). A causal connection may be inferred by a balance of probabilities. Collier v. Hill & Hill Exterminators, 322 S.W.2d 329, 337, 73 A.L.R.2d 1141 (Tex.Civ.App., Houston, 1959, no writ). See also Community Public Service Company v. Dugger, 430 S.W.2d 713, 719 (Tex.Civ.App., Texarkana, 1968, no writ); Athens Canning Company v. Ballard, 365 S.W.2d 369 (Tex.Civ.App., Houston, 1963, no writ).

Ice company, admitting that the case was tried properly under the doctrine of strict liability, points to a distinction in the status it occupies in this litigation from that of the restaurant owner. The restaurant patrons dealt directly with the owner and had the right to rely upon his implied warranty that *everything* which was served to them, including the ice, was fit for human consumption and would not cause injury or illness. Restatement, § 402A, Comment f, provides that the rule "applies . . . to the operator of a restaurant."

As to the ice company, however, its liability is slightly different. It delivered the ice to the restaurant and the burden was upon the patron and the restaurant owner, if either were to prevail, to show that it was defective or unfit for its use *at the time of delivery*. When the offending object is in a sealed container, there is no serious problem. McKisson v. Sales Affiliates, Inc., supra, 416 S.W.2d at p. 792. But, here the ice was delivered in a bag open at the top, the delivery being made before noon on the date in question. The open container was kept in a walk-in cooler used for storage of other foods and used by the restaurant personnel regularly. It was taken from the cooler, emptied into a bin, into another container, and finally placed in glasses for service to the ultimate patron. In the time between its original delivery to

restaurant and its final use by the patron, it was not within control of the ice company and there were many opportunities for *possible* contamination thereof from many sources.

■ Even if the proof had been unchallenged and uncontradicted that the ice was a producing cause of the illness of the patrons, which is contrary to our record, there was no evidence tending to show that it was in an unwholesome condition at the time it was originally delivered to the restaurant. We invoke the doctrine used in Coca Cola Bottling Company of Houston v. Hobart, 423 S.W.2d 118, 125 (Tex.Civ. App., Houston [14th Dist.] 1967, writ ref. n. r. e.), an exploding bottle case.

In *Hobart*, Justice Barron reviewed the authorities and concluded that while plaintiffs had established that the bottle in question was defective at the time the plaintiffs purchased it from the retailer, they failed to establish that it was defective at the time it was delivered by the manufacturer to the retailer. This holding was based, primarily, upon the fact that the plaintiffs (and the retailer who sought and procured indemnity from the bottler) had failed to establish that the bottle at the time of its final sale was in a defective condition when delivered. The plaintiffs and the restaurant here are in a similar situation.

We are of the opinion that the restaurant patrons have discharged their burden of proof, by circumstantial evidence, that *something* ingested by them at the restaurant was unwholesome and unfit for human consumption. We are, however, convinced from our review of the record that there is no evidence in the record which supports the finding that the ice—either at the time it was delivered to the restaurant or at the time it was served to the patrons—was unwholesome or unfit for human consumption.

As to the ice company, plaintiffs have failed to discharge the "prime requirement" for invoking the rule of strict liability and the trial court erred in not instructing the jury to return a verdict for the ice company and against the patrons and the restaurant upon its third party claim for damages and for indemnity.

So holding, we sustain the following points brought forward by ice company: point nos. 1, 2, 3, 4, 5, and 7, are here and now reverse the judgment of the trial court and render judgment that the original plaintiffs and the third party plaintiffs take nothing against the ice company.[3]

The restaurant owner, Hebert, in his posture as an appellant, has brought forward many points which are covered by our foregoing discussion. Without restating the evidence or summarizing the points, it is sufficient to say that from our prior discussion we also sustain Hebert's point nos. 12, 13, 15, 16, 18 and 19 relating to the ice.

Hebert, as an appellant, also brings forward points which contend that the favorable findings procured by the plaintiffs were each and all against the great weight and preponderance of the evidence. Having reviewed the record as a whole, such points are each overruled. The plaintiffs met their burden, as we have indicated previously, of establishing by circumstantial evidence that something served to them in the restaurant was the producing cause of their illness and damage.

We have examined Hebert's remaining points seeking a reversal of the judgment in favor of the patrons and none reflect error and each is overruled. Hebert, as a cross-plaintiff, has certain cross-points complaining of the admission of certain testimony. Our examination does not reveal

---

3. So holding, we do not reach the ice company's contention that Hebert could not recover his lost profits under the doctrine of strict liability, but his cause of action, if any, must be asserted under the Uniform Commercial Code. Cf. Thermal Supply of Texas, Inc. v. Asel, 468 S.W.2d 927, 929 (Tex.Civ.App., Austin, 1971, no writ).

that reversible error is presented thereby and such cross-points are overruled.

The judgment of the original plaintiffs against Port Arthur Consumers Ice Company and the judgment of Hebert for indemnity as well as the recovery of damages against the Port Arthur Consumers Ice Company is reversed and judgment is here rendered that said parties take nothing as against the ice company. The judgment in favor of the original plaintiffs against Hebert is affirmed. All costs are adjudged against Hebert.

Affirmed in part and in part reversed and rendered.