**Opinion issued November 18, 2021**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-19-00568-CV**

———————————

**BMLA, INC. D/B/A MURPHY'S DELI, Appellant**

**V.**

**KEZIAH JORDAN, Appellee**

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-17893**

## O P I N I O N

Plaintiff Keziah Jordan sustained serious injuries when she collapsed onto a

hard countertop in a doctor's office after experiencing severe gastric distress. Jordan

sued Defendant BMLA, Inc. doing business as Murphy's Deli ("Murphy's Deli") on

the theory that a kolache—sold by Murphy's Deli on medical center grounds and consumed by Jordan less than an hour before she became ill—caused her injury. A jury found that Murphy's Deli breached the implied warranty of fitness for a particular purpose and awarded Jordan a total of $400,000 in damages. The trial court entered judgment on the jury verdict.

On appeal, Murphy's Deli contends that (1) Jordan did not present legally or factually sufficient expert medical testimony that her illness was caused by consuming the kolache purchased from Murphy's Deli; and (2) Jordan did not present evidence that she had notified Murphy's Deli that a breach of warranty had occurred, as required to recover for breach of an implied warranty of fitness for a particular purpose. We agree with Murphy's Deli that the evidence was legally insufficient to sustain the verdict, and we reverse and remand for a new trial.

**Background**

On Monday, February 16, 2015, Keziah Jordan had a morning appointment scheduled with her cardiologist in the Texas Medical Center in Houston. Because of the tests that were to be performed, her cardiologist required her to fast from midnight until the time of her appointment. Prior to fasting, Jordan and her husband ate dinner on Saturday night and breakfast on Sunday morning. Neither of them became sick after eating these meals. On Sunday night, Jordan prepared baked ziti for dinner. Jordan, her husband, and her son all ate the same meal for dinner, and

2

none of them became sick that evening. The baked ziti was the last meal Jordan had before her cardiologist appointment on Monday morning.

Jordan completed her tests and lab work around 9:00 or 9:30 a.m., but her cardiologist was not yet present. Her doctor's receptionist told her that it was alright if she got something to eat, so Jordan went to Murphy's Deli located on the first floor of the building. Jordan ordered a sausage and cheese kolache and a kiwi strawberry Snapple to drink. The kolache was in a glass display case. Jordan took the kolache and the Snapple back upstairs to her doctor's office to eat in the waiting room. Jordan testified that the kolache "tasted a little off," but she ate all of it.

Less than an hour later, Jordan had "really bad stomach cramps" and started to feel nauseated. She had at least three or four episodes of diarrhea, and her stomach "was continually hurting." She checked with the receptionist several times to see if her cardiologist had arrived. The last time she checked with the receptionist, Jordan fainted. As she fell, her face hit the receptionist's desk, which was a granite or stone countertop. Jordan was taken to the emergency room. Jordan had several broken teeth and a broken jaw, requiring multiple dental procedures and surgeries to address her injuries. At the time of trial, she still experienced headaches and neck pain related to her injuries.

Dr. Syed Hasan, an internal medicine physician, testified as Jordan's causation witness. He examined Jordan after she was taken to the emergency room.

According to Dr. Hasan, Jordan presented with complaints including diarrhea, fainting, and an injured lip and teeth. Dr. Hasan estimated that the cause of Jordan's diarrhea—which caused Jordan to become dehydrated, triggering the fainting episode—was viral gastroenteritis.

Dr. Hasan did not conduct any testing to determine that Jordan had gastroenteritis but instead based his diagnosis on Jordan's presenting symptoms. Dr. Hasan based his diagnosis on the fact that Jordan did not have a fever; her white blood cell count was mildly elevated; and she had symptoms that included diarrhea, abdominal cramps, and nausea. He agreed that food is the "typical source of gastroenteritis." He did not make a specific determination that his diagnosis of gastroenteritis "came about as a result of Ms. Jordan consuming food." He did note in his records that Jordan told him, "I ate a dubious-tasting kolache."

When asked about the length of time it takes a person to contract viral gastroenteritis due to food consumption, Dr. Hasan stated, "It can be anywhere from—if it appears toxic, it can be within an hour to six hours or it can be as long as 12, 14, 48 hours for incubation." Dr. Hasan testified that he could not make an "absolute determination" of what caused Jordan's symptoms, which is why he wrote "likely viral gastroenteritis" in Jordan's medical records. Dr. Hasan testified that bacterial gastroenteritis—such as that caused by E. coli, salmonella, or shigella— also occurs, but viral gastroenteritis—such as that caused by norovirus or rotavirus—

4

is far more common. He testified that patients with bacterial gastroenteritis typically have a fever or bloody diarrhea, but Jordan did not have either of these symptoms. Dr. Hasan testified that, to a reasonable degree of medical probability, Jordan's fainting, nausea, and diarrhea were caused by gastroenteritis and not her underlying heart condition.

Nisha Virani testified as the corporate representative of BMLA,[1] which owned this particular Murphy's Deli franchise. Virani was in charge of food processes and safety and was present at this location "most of the time," but she was not present on the morning Jordan purchased the kolache. She testified that BMLA had never received any complaints concerning the food. Virani testified concerning the routine that Murphy's Deli employees followed when handling food, which involved washing hands and wearing gloves every time food was handled.

Virani also testified that Murphy's Deli receives kolaches that have been prepared by a third party, and she described how Murphy's Deli handles the kolaches that it receives. Upon receiving the kolaches, employees store them in a freezer with a notation of the date of receipt and the expiration date. The night before a kolache is to be set out for sale, an employee removes the kolache from the freezer, wraps it in saran wrap, and places it in a refrigerator. The next day, the kolache is placed in

---

[1] Virani and her husband own BMLA. BMLA sold this particular Murphy's Deli franchise after Jordan's injury and before BMLA was served with Jordan's lawsuit.

a temperature-controlled unit for sale. If a customer purchases a kolache, an employee microwaves the kolache for approximately thirty seconds and either places it on a plate or wraps it up in a to-go bag. If a kolache is not sold, an employee puts it back in the refrigerator in preparation for sale the next day, except on Fridays, when all unsold items are discarded. Virani testified that the store's freezers and refrigerators are inspected by the City of Houston every six months and by Murphy's Deli every month. She stated that there were no issues with the freezers and refrigerators around the time of this incident.

Murphy's Deli also presented deposition testimony from Richard Stier, a food scientist specializing in food safety, sanitation, and food processing. He reviewed the depositions of Virani, Jordan, and the owner of the distribution company that provided the kolache to Murphy's Deli, as well as Jordan's medical records. Based on Virani's deposition testimony, Stier testified that Murphy's Deli received the kolaches frozen, kept them in the freezer until the night before they were placed out for sale when they would be moved to a refrigerator, and were then moved to a refrigerated display cabinet on the day of sale. Again based on Virani's deposition testimony, Stier testified that kolaches were handled at all times by employees wearing gloves "so there is no human contact directly with the kolache from receipt, you know, to service with the customer." Stier testified that, for contamination to occur, "there would have to be a break in the cold chain at some point in time," but

6

he had seen no evidence of a break in the cold chain, "no evidence of temperature abuse of the product," and no evidence of mishandling resulting in cross-contamination. He did not see any "evidence to support that this product, this particular kolache, could have become tainted."

Stier testified that he is not a doctor, and he did not dispute Dr. Hasan's diagnosis. He agreed that gastroenteritis "is a common symptom of most foodborne illnesses," that viral gastroenteritis "is a form of food poisoning," and that a kolache that causes food poisoning is a "defective" kolache. He testified, however, that based on Dr. Hasan's diagnosis of viral gastroenteritis, "there is no way that the kolache could have caused the illness." He also agreed that it would be important to know what Jordan had eaten "10, 12, 24, 36 hours before she had this incident, or who she was exposed to." He stated that it would also be important to know whether people who ate the same food that she did the previous day were affected by food poisoning. He agreed that it was "pretty important" that Jordan's family members ate the same food she did on Sunday night but none of them had food poisoning. He testified, however, that that does "[n]ot necessarily" rule out the Sunday night dinner as the cause of her food poisoning because "[p]eople have different sensitivities to different things."

Stier also testified that a staphylococcus aureus infection could develop in as short as thirty minutes. He agreed that experiencing gastroenteritis symptoms within

7

thirty minutes after consuming contaminated food was consistent with exposure to staph. He testified that staph, if present, can develop in food kept at 70 degrees and above for three hours or kept at 50 degrees and above for ten hours. He stated that, according to Virani's deposition, the night before the kolaches are sold, they are kept in a refrigerator set between 36 and 38 degrees. He also testified that "having a dubious flavor does not necessarily mean staph aureus was growing in that."

The sole theory of liability presented in the jury charge was whether Murphy's Deli, in selling the kolache to Jordan, breached the implied warranty of fitness for a particular purpose.[2] The jury found that Murphy's Deli was engaged in the business of selling kolaches; Murphy's Deli breached the implied warranty of fitness for a particular purpose; and Jordan's injury was proximately caused by the defective condition of the kolache served to her. The jury awarded Jordan $150,000 for past physical pain and suffering; $50,000 for future physical pain and suffering; $50,000 for past mental anguish; $25,000 for past physical impairment; $25,000 for future physical impairment; $90,000 for past physical disfigurement; and $10,000 for

---

[2] This claim was not pleaded. Jordan pleaded both strict liability and breach of the implied warranty of merchantability. At the charge conference, Jordan argued that submitting the case under the implied warranty of fitness for particular purpose was "well within the pleadings" and "[t]he evidence fits it." The trial court agreed to submit the case under that theory. Murphy's Deli argued at trial that there was "no evidence that the product sold breached any type of implied warranty," but Murphy's Deli has not appealed on this basis.

future physical disfigurement. Neither party requested a jury submission on whether Jordan provided reasonable notice of her injury to Murphy's Deli.

The trial court entered judgment on the jury verdict.[3] Murphy's Deli moved for a new trial and asserted several grounds. Murphy's Deli argued that the jury's liability finding was against the great weight and preponderance of the evidence, stating that there was no credible evidence that the kolache was tainted or that Murphy's Deli was responsible for any problems with the kolache. Murphy's Deli also argued that Jordan failed to plead and prove an essential element of her winning claim: that she notified Murphy's Deli of the breach of warranty of fitness for a particular purpose within a reasonable time period. This motion was overruled by operation of law, and Jordan appealed.

## Evidentiary Sufficiency of Causation

In its first issue, Murphy's Deli contends that the trial court erred by entering judgment on the jury verdict because Jordan did not present legally or factually sufficient evidence that consuming the kolache caused her injuries. We agree that there was legally insufficient evidence of causation and reverse the judgment.

---

[3] BMLA was entitled to $3,000 in credits and offsets due to co-defendants that had settled with Jordan. The trial court also awarded pre- and post-judgment interest and costs to Jordan.

## A. *Standard of Review and Governing Law*

When reviewing the legal sufficiency of the evidence supporting a jury verdict, we determine whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict under review. *Berkel & Co. Contractors, Inc. v. Lee*, 612 S.W.3d 280, 284 (Tex. 2020). We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference in favor of the verdict. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). We will sustain a legal sufficiency challenge if (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009) (quoting *Kroger Tex. Ltd P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006)).

To establish causation in a personal injury case, the plaintiff must prove that the defendant's conduct caused an event, and this event caused the plaintiff to suffer compensable injuries. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). "[E]xpert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007)).

"[I]f evidence presents 'other plausible causes of the injury or condition that could be negated, the [proponent of the testimony] must offer evidence excluding those causes with reasonable certainty.'" *Id.* (quoting *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010)). To constitute evidence of causation, an expert opinion, whether that opinion is expressed in testimony or in a medical record, "must rest in reasonable medical probability." *Burroughs Wellcome*, 907 S.W.2d at 500. "Reasonable probability is determined by the substance and context of the opinion, and does not turn on semantics or on the use of a particular term or phrase." *Id.*

## B.    *Preservation*

In its motion for new trial, Murphy's Deli raised several issues, including the following: "The jury finding of liability against the defendant is against the great weight and preponderance of the evidence. There is no credible evidence the kolache

11

sold to plaintiff was tainted or that defendant was responsible for any problems related to the product." Murphy's Deli stated, "There is no credible evidence the food product in question was tainted while in the possession of the Defendant." Murphy's Deli pointed to testimony from Jordan that she became ill within an hour of consuming the kolache and testimony from Dr. Hasan concerning the incubation period of viral gastroenteritis. It argued, "The record does not contain any competent evidence that the incubation period is less than one hour."

No party has argued that Murphy's Deli failed to preserve its legal sufficiency challenge on appeal to this Court. Nevertheless, the dissent would find that Murphy's Deli's allegation of "no credible evidence" in its motion for new trial is linguistically incapable of raising a legal sufficiency challenge and therefore Murphy's Deli did not preserve its legal sufficiency complaint for appellate review. *See, e.g.*, *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992) (stating ways in which party may preserve legal sufficiency challenge following civil jury trial). The dissent reasons that evidentiary credibility is always a question for the jury, never a threshold test for the court.

We disagree. Although the jury is the ultimate arbiter of lay witness credibility, the Texas Supreme Court has adopted "gate keeping standards" for expert testimony. *See City of Keller*, 168 S.W.3d at 812–13. The Texas Supreme Court has held that "conclusory" expert testimony is "incompetent evidence" that is

legally insufficient to support a judgment. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004); *Cas. Underwriters v. Rhone*, 132 S.W.2d 97, 99 (Tex. 1939) (holding that witness's statements were "but bare conclusions and therefore incompetent"); *see also Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) (stating, in appeal of order denying summary judgment, that expert witness's conclusory statement will not "raise a fact issue to defeat summary judgment"). "A statement of an expert witness that has no facts to support the expert's conclusions is insufficient to create a question of fact . . . *because it is not credible* . . . ." *Shelton v. Sargent*, 144 S.W.3d 113, 125–26 (Tex. App.—Fort Worth 2004, pet. denied) (emphasis added). Simply put, in the realm of expert witnesses, testimony that is not credible is legally insufficient to support a judgment.

The dissent argues that the term "no evidence" connotes legal insufficiency whereas the term "no credible evidence" connotes factual insufficiency. Texas Supreme Court caselaw forecloses this argument. In *Jelinek v. Casas*, the Texas Supreme Court confirmed that when sufficiency turns on expert testimony, legal insufficiency results when there is "no credible evidence." 328 S.W.3d 526 (Tex. 2010). The court in *Jelinek* held that the evidence was legally insufficient to support the jury's finding that the hospital's negligence caused the cancer patient's additional pain and suffering. *Id.* at 535–38. Specifically, the court faulted the

13

plaintiff's medical expert for failing to explain why a negligence-induced infection was a more medically probable cause than other potential causes of the patient's additional pain and suffering. *Id.* at 536–37. In so holding, the court reiterated the necessity of "credible evidence" to survive a no-evidence challenge:

> Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings when those findings are not supported by *credible evidence.* When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role *by sustaining a no-evidence challenge.*

*Id.* at 538 (emphasis added).

*Jelinek*'s reasoning is straightforward: when the testimonial evidence supplied by the expert is not credible, then the court must grant a "no-evidence" challenge. *See id.*; *see also Holt Atherton Indus., Inc. v. Heine*, 797 S.W.2d 250, 252 (Tex. App.—Corpus Christi–Edinburg 1990) ("By its third point of error, Holt contends that there was no credible evidence to support the trial court's award of $120,000.00 for lost income resulting from the loss of use of the bulldozer. . . . By asserting a 'no evidence' point, Holt is challenging the legal sufficiency of the evidence . . . ."), *aff'd in part, rev'd in part on other grounds*, 835 S.W.2d 80 (Tex. 1992). Murphy's Deli did not waive its legal sufficiency appellate issue.

Finding no waiver of Murphy's Deli's legal sufficiency challenge, we proceed to the merits.

14

## C.	Sufficiency of the Causation Evidence

To recover against Murphy's Deli, Jordan was required to prove that Murphy's Deli breached the implied warranty of fitness for a particular purpose and that her injury was proximately caused by this breach. The test for cause in fact is whether the illness would not have occurred if Jordan had not eaten the kolache. *See Smith v. Landry's Crab Shack, Inc.*, 183 S.W.3d 512, 514 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex. 2003) ("The test for cause in fact, or 'but for causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'") (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)). As explained below, we agree with Murphy's Deli that there was legally insufficient evidence that the kolache caused Jordan's illness and ultimate injuries.

### 1.	Analysis

A finding of cause in fact may be based on circumstantial evidence, but it cannot be supported by mere conjecture, guess, or speculation. *Smith*, 183 S.W.3d at 514. Similarly, a fact may not be inferred from circumstantial evidence that could support multiple inferences if none are more probable than the others. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). The jury may not infer an ultimate fact from "meager circumstantial evidence which could give rise to any number of

15

inferences, none more probable than another." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (quoting *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995)).

We note at the outset that neither party has presented this Court with any case in which an alleged food poisoning case was tried under the theory of breach of warranty of fitness for a particular purpose. The law implies a warranty that goods are fit for some particular purpose when the seller, at the time of the transaction, has reason to know of the particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. TEX. BUS. & COM. CODE § 2.315. The particular purpose must be a particular non-ordinary purpose. *Miles v. Ford Motor Co.*, 922 S.W.2d 572, 587 (Tex. App.—Texarkana 1996), *rev'd in part on other grounds*, 967 S.W.2d 377 (Tex. 1998); *see Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex. App.—Eastland 2002, pet. denied) (holding that purchasers could not recover against automobile dealership and manufacturer for breach of implied warranty of fitness for particular purpose where there was no evidence that they purchased vehicle for any purpose other than for ordinary purpose of transportation, or that they purchased air bag as part of vehicle for purpose other than ordinary purpose of providing restraint in event of collision).

16

Here, it appears that the kolache was purchased for ordinary consumption purposes, but Murphy's Deli has not appealed on that basis. Assuming *arguendo* that consumption could be a specific and non-ordinary purpose for a kolache, Jordan has not provided legally sufficient evidence that she would not have fallen ill but for consuming the kolache.

It is undisputed that no testing was performed on the kolache that sickened Jordan. Nor was there any testing performed on any other kolaches from Murphy's Deli near the time of Jordan's illness. Murphy's Deli received no customer complaints regarding food poisoning near the time that Jordan purchased her kolache, and Murphy's Deli had not received any health code violations. And while Jordan was treated at the hospital for her illness, Jordan did not undergo any testing to determine what pathogen had caused her symptoms.

Having no such proof, Jordan was required to prove medical causation through the expert testimony of Dr. Hasan, her treating physician. The Texas Supreme Court has held that "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of [laypersons]." *Guevara*, 247 S.W.3d at 665. In the absence of expert medical testimony, laypersons do not have the common knowledge and experience to adequately evaluate the cause of Jordan's gastroenteritis. Therefore, expert medical testimony was necessary to establish causation.

17

Dr. Hasan therefore had to supply proof that consuming the kolache was—to a reasonable medical probability—the cause of Jordan's illness. He did not do so. At best, Dr. Hasan testified that most gastroenteritis is caused by food, and the kolache could have caused her illness. This was not enough. To constitute evidence of medical causation, an expert opinion must rest on reasonable medical probability. *Burroughs Wellcome*, 907 S.W.2d at 500. Reasonable probability is determined by the substance and context of an expert opinion, rather than the use of any particular words. *Id.* Where the substance of an expert's testimony establishes only a mere possibility, rather than a reasonable probability, of causation, it is no evidence of causation. *See Schaefer v. Tex. Empl'rs' Ins. Ass'n*, 612 S.W.2d 199, 204–05 (Tex. 1980).

Dr. Hasan supplied no testimony that could bridge this analytical gap. It is undisputed that Jordan consumed the kolache within an hour of falling ill at her cardiologist's office. Although Dr. Hasan agreed that it was "a possibility" that "she had contracted gastroenteritis and experienced a rapid onset within an hour," he did not testify that this was a medical probability. According to Dr. Hasan, the latency period for gastroenteritis can be as long as 72 hours. Dr. Hasan did not testify that the kolache was more likely to have caused her illness than other foods that she consumed within that time period. Indeed, he made no attempt to rule out other foods that she had eaten within the incubation period.

18

Unable to rule out other food sources of her illness, Jordan implicates the kolache on the ground that it tasted "off" or "dubious." There is no expert testimony that would permit the jury to find medical causation based on the kolache's taste. Although Dr. Hasan testified that a virus could be present on a food item and infect a person who eats it, he did not testify that the presence of a virus would affect the kolache's taste.

Jordan nevertheless points to the following testimony by Dr. Hasan as substantiating the necessary connection between the kolache and Jordan's illness:

> Q    Okay. Now, seeing as Ms. Jordan had not eaten anything prior [to] the kolache in eight hours and then she eats a reheated kolache and then in about an hour falls ill, is it possible that she had contracted gastroenteritis from exposure to the staph toxin?
>
> A    That's possible.
>
> Q    If we're able to rule out other sources of foodborne illness from other foods that she had eaten the previous day, do you think more likely than not the rapid onset of her symptoms following eating the kolache was caused by this particular type of pathogen in the kolache?
>
> A    I would agree with that.

This testimony is irrelevant for two reasons. First, the exchange was a hypothetical question about gastroenteritis caused by staphylococcus toxin. Dr. Hasan testified that staphylococcus is a type of bacteria, not a virus. Dr. Hasan diagnosed Jordan with *viral gastroenteritis*, not bacterial gastroenteritis. No evidence was presented that Jordan had a staphylococcus infection, only speculation

that this could be possible. Consequently, this line of questioning regarding the staphylococcus pathogen does not create a legally sufficient basis for the jury's verdict. *See Coastal Transp. Co.*, 136 S.W.3d at 232 ("Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'") (quoting TEX. R. EVID. 401).

Second, Dr. Hasan did not rule out any other food sources, much less every other food source that Jordan consumed the previous day. No witness testified to every meal that Jordan consumed during the entire incubation period. Jordan became ill on Monday morning, but the record contains no evidence about what she ate before dinner on Saturday or throughout the day on Friday.

Alternatively, Jordan argues that it was enough for the jury to find that the kolache contained a "pure toxin" that sickened her. Not so. Dr. Hasan diagnosed Jordan as having viral gastroenteritis, not as having consumed a "pure toxin." Although Dr. Hasan suggested at one point that viral gastroenteritis could "appear toxic," he ultimately distinguished between gastroenteritis from ingesting "a possible toxin or a virus or a potential bacteria." Later, when questioned specifically about what toxins could cause viral gastroenteritis, he *only referred to bacterial causes*:

> Q       Okay. If staphylococcus is not viral, which we've established?

20

A    Correct.

Q    All right. Then the staphylococcus can be—cannot be the cause of her viral gastroenteritis?

A    Right.

Q    Okay. Now, Doctor, what other toxins could you tell us would cause viral gastroenteritis?

A    So you can have a—the most common one is a shiga toxin. So you can get that from shigella. Salmonella can also produce a toxin. E. coli can also produce a toxin. So these are toxins.

Significantly, Dr. Hasan testified unequivocally that "E. coli, salmonella, shigella, things of that nature" cause bacterial gastroenteritis. These pathogens are not viruses. Dr. Hasan never identified a single virus that would create a toxin.

Unable to identify a single viral source of "toxins" in food, Dr. Hasan's suggestion that Jordan was sickened by a "toxin directly" is pure *ipse dixit*. "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). When the expert does not explain his factual basis, the testimony is conclusory, and the judgment cannot stand. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). The Texas Supreme Court has made it clear that "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Id.* (quoting *Coastal Transp. Co.*, 136 S.W.3d at 232). Nothing more exists here.

21

Our holding of legal insufficiency finds support in prior food-poisoning cases from our Court and the Fourteenth Court of Appeals. In *Farroux v. Denny's Restaurants, Inc.*, we affirmed a summary judgment in favor of Denny's because there was no evidence that the food consumed at Denny's had caused the plaintiff's illness and hospitalization. 962 S.W.2d 108 (Tex. App.—Houston [1st Dist.] 1997, no writ). We held that the plaintiffs' medical records showed that his diagnosis was "acute viral gastroenteritis and obesity," and "[n]othing in the plaintiff's medical records indicates that plaintiff suffered from food poisoning after he ate at Denny's." *Id.* at 109, 110–11. Furthermore, the plaintiff conceded in his deposition that his own personal physician told him that there were too many possibilities to determine what caused his illness.[4] *Id.* at 109. Similarly, Dr. Hasan testified that the causes of viral gastroenteritis are "numerous," and he did not make a specific determination that the kolache caused Jordan's illness.

The Fourteenth Court's opinion in *Smith v. Landry's Crab Shack*, *Inc.* is also instructive. *See* 183 S.W.3d at 514. In that case, plaintiff Smith sued Landry's for strict liability, breach of warranties, DTPA violations, and negligence after she allegedly suffered food poisoning as a result of eating at a Joe's Crab Shack. *Id.* The

---

[4]     The plaintiff later filed a sham affidavit to the contrary, which we rejected. *See Farroux v. Denny's Rests., Inc.*, 962 S.W.2d 108, 111 (Tex. App.—Houston [1st Dist.] 1997, no writ).

trial court granted summary judgment for the defendant, and the Fourteenth Court affirmed.

The evidence in *Smith* was even stronger than the evidence presented here. Smith testified that the food she ate at Joe's Crab Shack "was the only food she had consumed within the 20 hours preceding the onset of her illness," and the meal she had eaten prior to the restaurant "had also been eaten by her entire family without incident." *Id.* Whereas Dr. Hasan never testified to the "most common" onset period for foodborne gastroenteritis, Smith's medical expert testified that the "most common" period for onset was 24 hours from consumption. *Id.* at 515.

Smith's medical expert did not stop there. He also testified that (1) none of the circumstances of Smith's illness or treatment was inconsistent with a diagnosis of gastroenteritis; (2) gastroenteritis can be caused by bacteria in food; (3) many foods can be a carrier for such bacteria; (4) different bacteria have different incubation periods before a person begins to experience symptoms; (5) starting to experience symptoms within five hours of a meal and getting sick enough to be admitted to a hospital within about ten hours of a meal would, in reasonable medical probability, be "consistent with" food-borne gastroenteritis; and (6) although it was possible that Smith had gastroenteritis from some other source than food poisoning, it was "more likely" that she had food poisoning considering "the clinical history and the set up." *Id.* at 514–15.

23

Even so, the Fourteenth Court found that this testimony was legally insufficient to create a fact issue. *Id.* at 515. That was because the medical expert's "opinion that Smith's gastroenteritis was caused by food rather than another source was not stated as being in reasonable medical probability, but only as being more likely, and because he provided no factual basis or explanation for why the clinical history and set up showed this to be the case." *Id.*

The testimony here fares no better. Dr. Hasan did not testify that the kolache was—in reasonable medical probability—the source of Jordan's gastroenteritis. Nor did he provide any clinical history or set up to support such a conclusion. And although Dr. Hasan agreed to "give . . . the standard of reasonable medical probability, more likely than not" at the outset of his testimony, these words are not a cure-all. Reasonable probability is determined by the substance and context of an expert opinion, rather than the use of any particular words. *Burroughs Wellcome*, 907 S.W.2d at 500. Dr. Hasan's testimony regarding the kolache did not meet this threshold. Furthermore, the *Smith* court noted that there was "no evidence that any bacteria was actually found in Smith's system that could have caused food poisoning, let alone any evidence of its source." 183 S.W.3d at 515 n.2. The same is true here.

## 2. *Response to the Dissent*

The dissent cites multiple cases in support of its argument that the evidence was legally sufficient. Many of those cases supply striking contrasts that reveal why there is no legally competent testimony here. For example, in *Wilson v. Circus Circus Hotels, Inc.*, the Nevada Supreme Court found sufficient evidence where the plaintiff's medical expert gave an "80% chance" that the hotel's food had caused the child's salmonella poisoning where the child had eaten exclusively at the hotel during the 52 hours before the onset of symptoms. 710 P.2d 77, 78 (Nev. 1985) (per curiam). There was also testimony that "[m]ost people become ill [from salmonella poisoning] within 36 hours of ingestion." *Id.* at 79. By contrast, Jordan ate only one meal at Murphy's Deli during the incubation period for gastroenteritis, and Dr. Hasan never testified that most people become ill within an hour of ingestion.

*San Francisco v. Wendy*'s *International* is equally revealing. There, the plaintiff's medical expert "eliminated various likely causes and concluded that the most probable cause of Mr. San Francisco's problem was a foodborne illness caused by the allegedly undercooked Wendy's hamburger." *San Francisco v. Wendy's Int'l, Inc.*, 656 S.E.2d 485, 497 (W. Va. 2007). When asked why he chose the undercooked hamburger as the cause of plaintiff's illness as opposed to other possibilities, the expert explained that "[i]t's the highest probability of a series of possibilities." *Id.*

25

By contrast, Dr. Hasan did not purport to eliminate any other sources—food or otherwise—as the cause of Jordan's illness. This failure is particularly problematic given Jordan's purchase of the food on Medical Center grounds, where Jordan could have encountered other germ sources. Nor did Dr. Hasan rank the kolache against other possible sources of illness.

The dissent's other cases are distinguishable because they did not require expert testimony on medical causation. *Miller v. Atl. Bottling Corp.*, 191 S.E.2d 518, 519–20 (S.C. 1972);[5] *Patterson v. Kevon, LLC*, 818 S.E.2d 575, 580–81 (Ga. 2018) (reversing summary judgment in favor of defendant catering company even though plaintiff did not present expert testimony on causation when defendant's circumstantial evidence failed to rebut plaintiff's circumstantial evidence). That path is foreclosed here. The Texas Supreme Court has reiterated that "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience" of laypersons. *Guevara*, 247 S.W.3d at 665; *see JLG Trucking*, 466 S.W.3d at 162. Ordinary laypersons do not have the expertise to

---

[5]  *Miller* is readily distinguishable. The plaintiff vomited repeatedly after discovering a "large mass of unidentified foreign substance" with a "vile" smell and taste in a Mountain Dew that she was consuming. *Miller v. Atl. Bottling Corp.*, 191 S.E.2d 518, 519 (S.C. 1972). The South Carolina Supreme Court held that "[n]either a chemical analysis nor expert testimony was necessary to establish that such a substance in a bottled drink was unwholesome and unfit for human consumption." *Id.* Here, there was no evidence of a foreign mass inside the kolache that could dispense with a need for expert testimony.

determine the cause of viral gastroenteritis. Expert testimony, therefore, was necessary.

Finally, the dissent cites a Texas case—*Hebert v. Loveless*—for the proposition that expert testimony on medical causation should not be required in the face of significant circumstantial evidence of food poisoning. *See* 474 S.W.2d 732, 738 (Tex. App.—Beaumont 1971, writ ref'd n.r.e.) (upholding food-poisoning verdict against restaurant from legal and factual sufficiency challenges where at least fifteen persons became ill after eating at same restaurant on same date). We need not examine this question, as a food product's mere "dubious" or "off" taste is not in the same league as fifteen people falling ill on the same day with similar symptoms. But even so, the *Hebert* case had expert testimony of the sort that is missing here: two physicians testified that their patients were sickened by something that they ate or drank at the restaurant. *Id.* at 735–76. Dr. Hasan drew no such conclusion.

Ultimately, the dissent hangs its hat on two pieces of evidence: Dr. Hasan's testimony that gastroenteritis is more often than not caused by food,[6] and the evidence that the kolache tasted "off." This is not enough. To humanity's chagrin,

---

[6] Dr. Hasan did not testify that viral gastroenteritis—as opposed to gastroenteritis from all sources—is more often than not caused by food. This distinction matters. A statement that is true with respect to a broad category is not necessarily true as to a subcategory. For example, it is accurate to say that birds, more often than not, are able to fly. Penguins are birds, but it would not be accurate to say that penguins, more often than not, are able to fly.

27

gastroenteritis is a common ailment. Texas precedent demands more: competent expert testimony on the medical probability of causation. Lacking such evidence, we must reverse.

### 3.    *Remand for New Trial*

Despite the legal insufficiency of the evidence, we are compelled to remand for new trial in lieu of entering a take-nothing judgment. If a party raises a legal sufficiency challenge for the first time in context of a motion for new trial, then the party will be entitled only to a remand for new trial, not a rendition of judgment. *Werner v. Colwell,* 909 S.W.2d 866, 870 n.1 (Tex. 1995) (op. on reh'g) (remanding after sustaining legal insufficiency point because complaint was preserved only by motion for new trial); *Horrocks v. Tex. Dep't of Transp*., 852 S.W.2d 498, 499 (Tex. 1993) (per curiam) (holding that where legal sufficiency challenge was preserved only by motion for new trial, appellate court can only remand, not render judgment); *El-Khoury v. Kheir*, 241 S.W.3d 82, 90 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (holding that because appellant did not seek rendition of different judgment in trial court on basis of no evidence to support element of damages, appellate court could not "enlarge the relief preserved through the method that [appellant] chose" and was required to remand for new trial).

Here, Murphy's Deli did not move for a directed verdict on the medical proximate causation question at trial. Murphy's Deli raised this issue for the first

time in a motion for new trial. Consequently, we remand for a new trial and need not address Murphy's Deli's factual sufficiency point. TEX. R. APP. P. 47.1.

**Notification of Breach of Warranty of Fitness for a Particular Purpose**

In its second issue, Murphy's Deli argues that the judgment must be reversed because Jordan failed to secure a jury finding that she had notified Murphy's Deli of the alleged breach of implied warranty of fitness for a particular purpose. Texas Business and Commerce Code section 2.607(c)(1) requires the purchaser of goods, within a reasonable time, to notify the seller of any breach of warranty or be barred from any remedy under the theory of breach of warranty of fitness for a particular purpose. *See* TEX. BUS. & COM. CODE § 2.607(c)(1) ("[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."); *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

It is undisputed that the jury did not make any finding on whether Jordan provided Murphy's Deli with notice of a breach of warranty of fitness for a particular purpose. Neither party ever requested such a finding. Further, no party objected to the omission of a question on whether Jordan notified Murphy's Deli of a breach of warranty for a particular purpose.

In this procedural posture, Murphy's Deli argues that the judgment cannot stand because Jordan bore the burden of proof on the question of notice, and there is

no evidence that she ever supplied Murphy's Deli with notice of a breach of warranty of fitness for a particular purpose. By contrast, Jordan argues alternatively that (1) Murphy's Deli waived this issue in the trial court; (2) Jordan was excused from the requirement of providing notice; and (3) Jordan supplied the requisite notice by filing suit against Murphy's Deli.

"When an element of a claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element then the omitted element is deemed to have been found by the court in such manner as to support the judgment." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228–29 (Tex. 2011) (citing TEX. R. CIV. P. 279 and *In re J.F.C.*, 96 S.W.3d 256, 262–63 (Tex. 2002)). Here neither party objected to the charge on the basis that it omitted the element of notice and the trial court did not make findings on that element, so there is a deemed finding in support of the judgment. *See id.* at 229. "But just as with any other finding, there must be evidence to support a deemed finding" in Jordan's favor on the element of notice. *See id.* The question then becomes "whether legally sufficient evidence supports the finding here." *Id.*; *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990).

We need not resolve this question. As with its challenge to the sufficiency of the evidence, Murphy's Deli raised its challenge to the element of notice only in its motion for new trial. Consequently, even assuming *arguendo* that notice is an

essential element of Jordan's claim that she had to prove at trial, Murphy's Deli would be limited to the remedy of a new trial even if the evidence is legally insufficient to support a deemed finding. *See Werner*, 909 S.W.2d at 870 n.1; *Horrocks*, 852 S.W.2d at 499; *cf.* 6 McDonald & Carlson, *Tex. Civ. Prac. App. Prac.* § 18:16 (2d ed. 2020) (concluding that "deemed findings must be supported by evidence" and must "be attacked on the same basis as jury findings"). Because we are already remanding for a new trial due to the legal insufficiency of the causation evidence, we do not reach Murphy's Deli's second issue. TEX. R. APP. P. 47.1.

## Conclusion

We reverse the judgment of the trial court and remand for a new trial.

April L. Farris
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Farris.

Justice Goodman, dissenting.